# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### May 14, 2013 Session

## STATE OF TENNESSEE v. FREEMAN RAY HARRISON, JR.

### Direct Appeal from the Circuit Court for Rutherford County
No. F64778    David Bragg, Judge

---

### No. M2011-01803-CCA-R3-CD - Filed September 27, 2013

---

A Rutherford County jury convicted the Defendant, Freeman Ray Harrison, Jr., of two counts of aggravated sexual battery and one count of reckless endangerment, and the trial court sentenced the Defendant to a total effective sentence of twenty years, to be served at 100%. On appeal, the Defendant contends: (1) the evidence is insufficient to sustain his conviction for reckless endangerment and one of the counts of aggravated sexual battery; (2) the trial court erred when it allowed the victim's grandmother's testimony about the victim's initial "complaint"; (3) Rutherford County was not the appropriate venue; (4) the State's loss of a GPS device about which there was testimony rendered his trial fundamentally unfair; and (5) the trial court erred when it imposed consecutive sentences. After a thorough review of the record and applicable authorities, we conclude there exists no error in the judgments of the trial court. As such, the trial court's judgments are affirmed.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which CAMILLE R. MCMULLEN and ROGER A. PAGE, JJ., joined.

Andrew Love (on appeal) and Hugh Garrett (at trial), Nashville, Tennessee, for the Appellant, Freeman Ray Harrison, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Deshea Dulany Faughn, Assistant Attorney General; William Whitesell, District Attorney General; and Laural Hemenway, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

### I. Facts

This case arises from the Defendant's alleged sexual encounters with his minor step-granddaughter, S.L.,[1] in September 2009. For these encounters, a Rutherford County grand jury indicted the Defendant for rape of a child, aggravated sexual battery, incest, solicitation of sexual exploitation of a minor, and reckless endangerment.

## A. Trial

At the Defendant's trial, the parties presented the following evidence: S.L. testified that, at the time of trial, she was seven years old. She said that she lived in Murfreesboro in a house with her father, mother, baby sister, and her "Uncle Jeff." S.L. testified that she had a grandmother she called "[N]ana" and a grandfather she called "[P]eepaw." She identified the Defendant as "Peepaw."

S.L. recalled a time when she and her baby sister were in the Defendant's car with him. She said she was sitting in the back of his car on her "very old car seat" and that the Defendant was driving. As they were driving, the Defendant told her that she could come to the front of the car. At one of the red lights, S.L. moved to the front seat of the car and sat next to the Defendant. She said she was no longer, at this point, in a car seat.

S.L. testified that, during the drive, the Defendant took his penis[2] out of the hole in his pants. She said he "shaked it" and then "squeezed it" and then "white stuff came out." She said the "white stuff" looked like "pee." S.L. said that "[w]hen he let [the white stuff] go, it like just sucked in there." S.L. said, later, the Defendant "shaked it again and then squeezed it, and then more white stuff came out. And he touched it and tasted it and told her it was sweet. She tasted it, and the Defendant asked her if it was "sour or sweet," and she described the taste as "[s]our."

S.L. testified that, during the ride, the Defendant also asked her if she had to go "pee." She told him that she did not, and he said he was going to "check it." He stuck two fingers into her shorts and touched the inside of her vagina. S.L. said it felt "[t]icklish."

S.L. said that the Defendant told her he did not want her to tell anyone about what had happened, but she could not recall exactly what he said. She also recalled that, while they were still in the car together, he told her he would get into trouble if she told anyone.

---

[1]To protect the victim's privacy, it is the policy of the court to refer to the victim by initials only.

[2]The victim calls this portion of the male anatomy a "kidney." She identified where it was located and drew a picture of the Defendant's "kidney." She calls her own female genitalia a "flower." For sake of clarity, we will refer to the anatomy by its proper name.

S.L. said that she and the Defendant then went to her Nana's house, where she told her Nana she loved her. S.L. said that, when she arrived at the house, she felt "[s]ad" about what the Defendant had done. At trial, S.L. said she still felt "[a] little sad" about what the Defendant had done. S.L. testified that she spent the night at the home of the Defendant and her Nana.

S.L recalled speaking with "Nancy" in the State's Attorney's office. She also recalled watching a video of her interview with Nancy. S.L. said that "everything" she had testified about was the truth.

During cross-examination, S.L. testified that the Defendant drove a "little" white car and that he also had a truck and a motorcycle. S.L. said that, on one occasion, the Defendant fell off of his motorcycle and hurt his arm. As a result, he had a cast on his right hand. S.L. did not recall whether the Defendant was wearing the cast when the incident in the car occurred. She estimated that they had been in the car a "long" time before she climbed into the front seat, but she said that her Nana lived "far" away.

S.L. said she had met with "Ms. Laural" Hemenway, the State's attorney, a "couple times." Hemenway asked her questions and asked her to draw pictures. S.L. said she never told anyone what happened, not even her Nana. She was unsure how people found out.

On redirect examination, S.L. recalled going to the Child Advocacy Center and speaking with a "lady who read [her] a couple of books." S.L. did not recall what she told the person who interviewed her. She opined that everyone knew what had happened because they had seen the Defendant's action. S.L. said she would never tell a lie to get the Defendant in trouble.

On recross examination, the Defendant's attorney asked if anyone wanted to get the Defendant into "trouble." S.L. responded that her Nana wanted to get the Defendant into trouble.

Cynthia Jane Harrison, the Defendant's wife, testified that the two had been married almost nine years. They had known each other since she was seventeen years old, and she was fifty-three years old at the time of trial. Harrison recalled Labor Day weekend 2009, saying that she had fallen in her garage in the August before that Labor Day and suffered a significant, permanent neck injury. She said that she had two grandchildren, S.L. and S.L.'s sister. S.L., whose birthday was in May, was six years old on Labor Day 2009. S.L.'s sister was one year old at the time.

Harrison testified that the Defendant had returned home from Dallas on the Thursday

-3-

before Labor Day. The Defendant told Harrison repeatedly that he wanted to see S.L. Harrison had been unable to see her granddaughters for a few weeks due to her neck injury, and she told him "no," they could not come over. The Defendant asked for the telephone number of Harrison's son, who was S.L.'s father. Harrison expressed concern that she could not lift S.L.'s younger sister, who was one-year old, and still needed to have her diaper changed. The Defendant did not respond and said he would call and make the arrangements for the girls to come and stay with them. Harrison testified that part of her reluctance to have her granddaughters spend the night was that she had had a "misunderstanding" with her son, C.L., who was the girls' father.

Harrison recalled that, before the Defendant went to pick up the girls, they dropped off some motorcycle equipment at the home of her ex-husband, Tim Lewis, who was S.L.'s biological grandfather and with whom they were on good terms. She explained that they no longer needed the equipment because the Defendant had been in an accident on August 13, 2009, and totaled his motorcycle while in Dallas. Harrison was unsure what medication the doctors in Dallas had given to the Defendant for his "severe wounds from the accident." When he got home from Dallas, however, he was looking for his Acyclovir, which was medication that he took to treat his outbreaks of genital herpes. The Defendant repeatedly asked Harrison to find his medication. She located his medication and gave it to him. The Defendant was also prescribed Zovirax, which came in a tube and which he was to apply directly to areas of his genitalia that were "broken out."

Harrison said, before this occasion, the Defendant had never traveled alone to pick up her granddaughters. Harrison testified that, after the Defendant called her son and asked for the girls to spend the night, C.L.'s wife called her to tell her that the Defendant called C.L. and that C.L. agreed to allow the girls to stay with them. The Defendant left their house in Wilson County on Sunday morning at 9:00 or 10:00 a.m. in the couples' blue Pathfinder to get the girls, who lived in Rutherford County. Harrison said she was still sleeping at the time. Harrison said that the couple had three cars, and the Defendant normally drove a white, 350-Z. The Pathfinder, however, was their only car that had four seats, and she was sure it was the car he took to pick up S.L. and her sister. Harrison testified that S.L. and her sister had been in the car before and that they always sat in the backseat, in accordance with the child restraint law.

Harrison said that S.L. was potty-trained at three years old, and she could use the bathroom by herself. At the time of this incident, S.L. was six years old and fully capable of going to the bathroom by herself.

Harrison said that the Defendant arrived home with the girls at around 11:00 or 11:30 a.m., and the girls came inside the house and wanted to play with the toys she had there for

-4-

them. The Defendant also came inside and began discussing his desire to plan a barbecue with his family for that evening. Harrison was resistant to the idea because she was still not feeling well. The Defendant insisted, and he left to purchase food. His family arrived at around 5:00 p.m. Harrison said there were "lots of kids" at the barbecue, and she described the evening as having "a lot going on." Harrison said their guests did not leave until around 11:00 p.m., at which point Harrison got S.L. ready for bed.

While getting ready for bed, S.L. became upset and started to cry. The two had a conversation during which S.L. told Harrison that the Defendant had asked her during the car ride whether she needed to go to the bathroom. S.L. said she told him "no" but that the Defendant wanted her to come to the front seat to "feel" if she needed to go to the bathroom. Harrison said she asked S.L. what happened next, and S.L. demonstrated how the Defendant pulled her underwear and her shorts aside and placed his hands on her vaginal area to see if she needed to go to the bathroom. Harrison said she did not ask S.L. any further questions but walked her into the bedroom where S.L. and Harrison slept together. She told S.L. she would return shortly.

Harrison said that she checked on S.L.'s sister, who was being cared for by her son and his girlfriend, before finding the Defendant in the bonus room with his niece. She asked him to come outside so that she could speak with him. Harrison said she told the Defendant that S.L. had told her what he had done that morning. She relayed the account that S.L. gave and observed "a look of fear come into his eyes." The Defendant said, "I messed up, and we keep this just between me and you." Harrison said she responded to his statement in the negative.

Harrison testified that she went inside and asked her son and his girlfriend if they would spend the night at the house. She took S.L.'s sister and brought her into the room with her and S.L., where the three slept until morning. Harrison said that, the next morning, she called three people to tell them what S.L. had told her: Lewis, who is Harrison's ex-husband and S.L.'s grandfather; Cathy Barber, who is Harrison's sister; and Dianne Lewis, who is Harrison's friend. When she saw the Defendant come out of a bedroom, she told him that he needed to leave the house. She then went back into her bedroom and shut the door. Approximately 20 minutes later, she came out of her room and found that the Defendant was gone. He had not been back into the house since that time, although he did drive by to retrieve some medicine she left for him.

Harrison stated that she did not quickly call her son, S.L.'s father. She explained that her son did not like the Defendant because the Defendant had been abusive to Harrison in the past. She further explained she did not tell her son because she feared her son would physically harm the Defendant, and she did not want her son to go to prison for hurting the

Defendant. She said, "I was afraid [C.L.] would kill [the Defendant]."

Harrison testified that, later that day when S.L.'s parents picked up both girls, they asked about the Defendant, and Harrison told them that he had left her. Harrison said that in the weeks that followed, she saw the girls, and she went with them and their mother to Panama City for three days.

Harrison testified about another conversation with S.L. that occurred while S.L. was staying at her house. S.L. asked Harrison if she knew about "Peepaw and peeing." S.L. told her that the Defendant had taken his "kidney out" during the car ride and that he was rubbing it. S.L. said that "white stuff came out" but that she did not know what it was. S.L. said that the Defendant told her what it was but that she forgot. Harrison said she asked what happened next, and S.L. indicated that the Defendant pulled his shirt back down. Harrison said, after this conversation, she immediately called S.L.'s biological grandfather, Timothy Lewis. She told him that they could not wait any longer to notify the police. Timothy Lewis agreed, and the two went to speak with S.L.'s parents. This conversation occurred about three weeks after S.L.'s initial disclosure to Harrison.

After the conversation with C.L., Harrison called the Department of Human Services and then went to the Wilson County Sheriff's Department and filed a police report. The Wilson County Sheriff's Department contacted S.L.'s biological grandfather, C.L., and referred him to the Rutherford County Police Department, which ultimately investigated this case. Harrison testified that she provided the police with the Defendant's global positioning system ("GPS"), which was normally kept in his 350-Z but was in the Pathfinder on the day he went to get S.L. and her sister.

Harrison testified that she had spoken with the Defendant by telephone since the incident. Harrison called the Defendant from the police department, and the call was recorded. The telephone call was played for the jury. The Defendant stated in the call that he was "not too far from putting a rope around [his] neck." The Defendant never denied the events that she asked him about, namely his sexual interaction with S.L.

Harrison said that, after she confronted the Defendant about molesting S.L., he called multiple times and left her telephone messages. She provided a copy of those messages to the prosecution. These messages were then played for the jury. In the messages, the Defendant discussed being laid off from his job. The Defendant left Harrison a message on New Year's Eve in which he referred to something "tearing [him] apart."

During a bench conference, the Defendant objected to any mention by Harrison of what she saw on the GPS. The State's attorney informed the trial court that the GPS had

been in the courtroom on the first day of trial but that it had since disappeared. The detective involved in the case had requested video surveillance of the courtroom to investigate how the GPS disappeared, but he was informed that the cameras in the courtroom were only operational during the day. The trial court allowed Harrison to be questioned about what she had seen on the GPS and instructed the parties to continue attempting to locate the device.

Harrison then testified that the address in the GPS was S.L.'s address. The direction of travel indicated mostly interstate travel, upon which there were no stop lights. She indicated that there were very few stop lights between her house and S.L.'s house if one traveled the usual route.

Harrison testified that she filed for divorce from the Defendant in April 2010, after this incident occurred in September 2009. Harrison denied that she had anything to "gain" by the Defendant being charged in this case. She further stated that she would not put S.L. through all of this to gain an advantage in her divorce. Harrison said that she told S.L. to tell the truth in court and never told her how to testify. She said she had only spoken with S.L. about this incident on two occasions, in part because the detective assigned to the case told her not to discuss the incident with S.L.

Harrison testified that the Defendant had also been diagnosed with hepatitis C.

During cross-examination, Harrison testified that the last time that she looked at the missing GPS was in September of 2009. She was unsure of the exact date she gave the GPS to police, but she estimated it was in October. She gave it to police after noting the route it plotted for the Defendant when he was returning with S.L. and her sister. Harrison agreed that she could not be certain that the route listed on the GPS was the route actually traveled by the Defendant that day. Harrison said that she and her sister, Barber, looked at the routes on the GPS because she was "interested in where [the Defendant] had been."

Harrison explained that, when she first learned that the Defendant had inappropriately touched S.L., she was concerned for S.L., but she conceded that she did not report this information to the police or a doctor. Harrison testified that the Defendant had genital herpes at the time she met him, and he had been diagnosed with hepatitis C approximately three and a half years before the trial. She explained that she did not immediately contact the police, despite the Defendant having contagious diseases, because S.L. had only told her that the Defendant had touched her vagina with his hand. Harrison knew that the diseases could not contracted in this way. As soon as S.L. informed her about the "second part" of the Defendant's actions, Harrison contacted the authorities the following day.

Harrison testified that S.L. had ridden in a car with the Defendant on numerous

occasions, and she had ridden with him in his 350-Z. Harrison said that S.L. was mistaken if she said that she had never told Harrison about this incident. Harrison agreed that, when S.L. told her what had happened, she did not call police. She explained that she did not tell S.L.'s father immediately because she wanted to wait until the Defendant went back to Dallas for work. Then, she said, there would be "two days in between them," meaning it would take S.L.'s father at least two days to get to the Defendant, which would perhaps prevent S.L.'s father from having a violent reaction.

Harrison testified that she had encouraged the Defendant to seek mental health treatment but that she did not think he had ever done so. She said he "gets on very high highs . . . and gets on very low lows." She did not recall the Defendant making any previous suicidal statements. Harrison said that she thought the Defendant had made such statements previously to his mother.

During redirect examination, Harrison said that she filed for divorce from the Defendant on the grounds that he had been guilty of inappropriate marital conduct. She said that she had proof of this conduct, which was not related to the incident with S.L. She further testified that the Defendant, in divorce court proceedings, had not denied the allegations she asserted about his conduct. She said she did not seek any type of alimony in the divorce. Harrison said she did not mention S.L. during her divorce proceedings and did not call S.L. to testify as a witness.

Harrison said that, over Labor Day weekend, the Defendant had a brace on his arm that was removable. She said that the Defendant removed the brace when he showered and when she had engaged in sexual contact with him during that weekend.

Harrison testified that she had three sons, C.L., Jonathan Lewis, and Jeffery Lewis. Jonathan Lewis's biological father was the Defendant, with whom she had an affair while she was married to, but separated from, Timothy Lewis. The Defendant wanted her to abort the child, but she refused, and reconciled with Timothy Lewis, who adopted the child and treated him as his own.

Jonathan Lewis testified that the Defendant is his biological father, but Timothy Lewis raised him. Jonathan Lewis said that S.L. was his niece and that she sometimes came over to the home he shared with the Defendant and Harrison. He recounted that the Defendant was often traveling for work, so it was often just Jonathan Lewis and his mother at home. Jonathan Lewis recalled there being a party at his house with the Defendant and multiple people from the Defendant's family. Jonathan Lewis said he and his girlfriend cared for S.L.'s sister during the party. Jonathan Lewis denied that Harrison or Timothy Lewis told him about S.L.'s allegations the day following the party.

Jonathan Lewis testified that he had seen the Defendant treat Harrison in a way that would provide Harrison legitimate grounds for seeking divorce. These grounds had nothing to do with S.L.'s allegations.

Lori Hayes testified that she lived in the house adjacent to the home shared by the Defendant and Harrison. She recalled a party they held on the Sunday of Labor Day. She did not attend the party, but she observed the party and everyone seemed to be happy and having a good time. Hayes testified that, the following morning, Harrison came to her house and was "[v]ery upset, crying." Harrison entered her home, told her "some things," and then left and went back over to her own house. Hayes testified that Harrison, who was shaking, asked Hayes to watch over her house and make sure the Defendant did not return to the home. She said she did so, and she never saw the Defendant return.

Timothy L. Lewis testified that he first became acquainted with the Defendant in the "mid '80s" because the Defendant "was involved" with his wife at the time, Cynthia Harrison. Labor Day weekend of 2009, the Defendant called Timothy Lewis and asked if he wanted some motorcycle equipment. The Defendant explained that he had been in a motorcycle accident and did not want to purchase a new motorcycle. Timothy Lewis accepted the offer, and, later that day, the Defendant came to Timothy Lewis's house with Harrison to drop off a helmet, a jacket, tools, and some other items. While there, Timothy Lewis asked about the accident, and the Defendant showed him his scars and scabs on his legs and arms. Also during that conversation, the Defendant indicated that he was going to pick up Timothy Lewis's granddaughters, S.L. and her sister. Timothy Lewis said he was surprised by this because he had recently spoken with Harrison, who had told him that she was taking a break from keeping the girls.

Timothy Lewis explained that he and Harrison spoke frequently because they had three sons together, C.L., Jonathan Lewis, and Jeffrey Lewis. Timothy Lewis said that, while the Defendant was Jonathan Lewis's biological father, he had raised him since birth. He lived with Harrison until four years after Jonathan Lewis's birth, after which time he moved out because of the Defendant's continual pursuing of Harrison.

Timothy Lewis testified that, the Monday of Labor Day weekend, Harrison called him "distraught and upset . . . [and] very angry." Timothy Lewis testified that Harrison told him "something" about S.L. that he did not want to believe. Timothy Lewis said that he also became angry, and he and Harrison discussed what they should do in response to this information. Timothy Lewis thought that they should wait until the Defendant had left town for work before they told C.L. and the authorities. He said that he and Harrison were hoping to avoid a confrontation between the Defendant and C.L.

Timothy Lewis said that, after a few weeks, he felt it necessary to tell C.L., and he told Harrison that they should inform their son that day. Harrison agreed, but Timothy Lewis said that he was the one who pursued the issue of telling their son. Timothy Lewis said he and Harrison traveled to C.L.'s house to inform him of the allegations. Timothy Lewis testified that he never spoke with S.L. about these allegations, in part, because he did not want her to think she had done anything wrong. Timothy Lewis described Harrison as "nervous, anxi[ous], and sad" on their way to speak with C.L.

Timothy Lewis said that, when they arrived at C.L.'s house, C.L., C.L.'s wife, and Jeffrey Lewis, who was the youngest son of Timothy Lewis and Harrison, were present. Timothy Lewis said that he told C.L. that the Defendant had moved S.L. up to the front seat while they were driving, telling her that he needed to check and see if she was wet. C.L. "[i]mmediately . . . blew up," becoming angry, running around, and yelling. Timothy Lewis testified that all he knew at the time was that the Defendant had inappropriately touched S.L. Timothy Lewis said that, at that point, C.L. asked the whereabouts of the Defendant because he wanted to "go after him." Timothy Lewis told C.L. that he did not know where the Defendant was, and that he and Harrison had not seen the Defendant since Labor Day weekend.

Timothy Lewis said that he and Harrison attempted to calm C.L., telling C.L. that they wanted to make sure the Defendant was punished for the crime that he had committed. They asked him to let the "law handle it." C.L. went outside and remained by himself for approximately thirty minutes, and then he returned.

During cross-examination, Timothy Lewis testified that he and Harrison had been married thirteen years, getting divorced in 1989. Timothy Lewis agreed that he was angry at Harrison and the Defendant when he found out that Harrison had engaged in sexual activity with the Defendant while they were married. Timothy Lewis explained that he was surprised that the Defendant and Harrison were going to keep the girls on Labor Day weekend because Harrison had kept them for multiple weekends for a period of months. She had told him that she and C.L. had a disagreement and that she wanted a break from keeping the girls to get some rest.

On redirect examination, Timothy Lewis testified that he was more angry with the Defendant when he learned of the affair because the Defendant wanted Harrison to abort the child. Lewis did not agree with this decision, and he raised the child as his own.

C.L. testified that he was S.L.'s father. The Defendant, he said, was his step-father, and C.L.'s children called the Defendant "Peepaw." C.L. said that he recalled one occasion when the Defendant came alone to pick up both girls, but he did not remember the date of that occurrence. C.L. said that the girls had not gone to Harrison and the Defendant's house

in a while because C.L. and Harrison were having "some issues." Harrison called him, however, and said the Defendant had returned to town from work and wanted to see the girls. C.L. said she mentioned a cookout the following day.

C.L. said that, when the Defendant came to pick up the girls, C.L. placed both girls in their respective car seats in the back of the Pathfinder. S.L. was sitting on the driver's side, behind the Defendant. C.L. recalled that the Defendant had recently been in a motorcycle accident, and he showed him some "road rash" on his arms. C.L. did not recall the Defendant wearing a cast at the time. C.L. said that S.L., who was in kindergarten and six years old, was potty trained and wore panties. He said that she had never, with him, had an accident in her panties in the car.

C.L. said that when S.L. returned the following day she did not mention anything unusual about the weekend. He recounted that she was "[v]ery" close with Harrison and the Defendant, and she enjoyed going to their house.

C.L. said that, the following week, he and his wife, S.L., and his younger daughter L.L., and Harrison went to Florida for a few days' vacation. He said that he and Harrison "argued the whole time." He described Harrison's demeanor as "down."

C.L. recalled that, a week or so after the vacation, his parents came to his house. They called him on their way, saying they needed to talk to him. C.L. said that he was "very concerned," thinking that there must have been a death in his family because it seemed like "something was really wrong." After they arrived and spoke with him, C.L. said that he asked them why it took them so long to tell him and why Harrison had not told him while they were on vacation. C.L. said he was angry, frustrated, and hurt by the Defendant's actions. C.L. said he never spoke with S.L. about this, but he immediately took her to an agency designed to conduct sexual abuse interviews with children. C.L. said he was not present with S.L. when she was interviewed, nor was anyone from their family. Instead, he was with detectives attempting to verify the allegations.

C.L. testified that after this interview, he "blew up" at his parents for not telling him instantly. He said he still had a "[v]ery, very huge problem with them" as a result of this. C.L. said he took S.L. to a doctor and requested that they test her for any STD, particularly hepatitis and herpes, with which he was aware the Defendant was infected. S.L. ultimately tested negative for both diseases.

During cross-examination, C.L. estimated that, before his girls spent the night that September, it had been "a month or two" since they had been to Harrison's home. C.L. said that, the day he was informed of these allegations, he notified police and took S.L. for a forensic interview. He said he did not take S.L. to a doctor until he learned the extent of the

allegations.

J.L., the victim's step-mother, testified that S.L. is her step-daughter and that she and C.L. have another daughter, L.L., together. S.L. had lived with them permanently since March 2008. J.L. confirmed that the Defendant picked up S.L. and L.L. on the Sunday of Labor Day weekend. J.L. said the Defendant asked S.L. to sit up front with him, and J.L. specifically told him that S.L. was six years old and could not legally sit in the front.

J.L. testified that, a few weeks later, Harrison and Lewis came to her house to speak with C.L. and J.L. As a result of this conversation, the authorities were contacted. J.L. said she had never spoken with S.L. about these allegations.

During cross-examination, J.L. testified that she thought it was a "few days" before they took S.L. to speak with someone about the allegations.

Francesca Leggio, the Defendant's niece, testified that the Defendant, who was her mother's brother, called her or her mom "very last minute" and said they were having a Labor Day party. She found this "just really random as to why he would have a party with the whole family, because [the Defendant's] not family oriented." Leggio said the Defendant seemed like "something was wrong" in that he "wasn't really interacting" and "just pretty much sat upstairs the whole time." Leggio said that Harrison also appeared to be in "a bad mood." Leggio could tell "something was wrong with her." Leggio recalled that Harrison came into the bonus room where she and the Defendant were both sitting and asked for the Defendant to speak with her outside.

Flora Gooshaw, the Defendant's mother, testified that she did not go to a family party held at the Defendant's house over Labor Day. She did, however, see the Defendant on Tuesday or Wednesday after Labor Day. Gooshaw said the Defendant called her and told her that he was coming to see her. When he arrived, the Defendant sat down on a chair on the porch. Gooshaw asked the Defendant what was wrong, and the Defendant said "I just feel like just going in the woods and hanging myself." Gooshaw told him that he was "not going to do such a thing," and she asked the Defendant why he felt that way. The Defendant would not tell her why. The Defendant then told her that, when he was driving S.L. home, she climbed over the seat and told him that she had spilled something and that she was wet. He said that he felt the seat where she was sitting and that it was, in fact, wet. Gooshaw was unsure whether the Defendant felt S.L. panties to see if they, too, were wet.

During cross-examination, Gooshaw said the Defendant was visibly upset when he first came to her house. She said she had only once before heard him threaten to kill himself. Gooshaw said that Harrison called her on the day the Defendant arrived. Gooshaw said

-12-

Harrison called her at least once per day between the 7th and the 14th of September.

During redirect examination, Gooshaw testified that the last time the Defendant was suicidal was in 1996 when the Defendant "was on drugs."

Louise Bates testified that she first met the Defendant on January 23, 2010. They interacted over the internet, and they spoke on the telephone on February 6, making plans to watch the Superbowl together on February 7. Bates recalled that the Defendant discussed with her his wife and how much he cared for his wife. Bates said that the Defendant spent a few nights at her home when the two got snowed in together. Bates testified that, since this incident, she had become "very close friends" with the Defendant's family. Bates said she had sent the Defendant letters and money while he was incarcerated, and she estimated it totaled $300. She said the Defendant's mother then reimbursed her from the Defendant's money, which he kept locked in a safe at his mother's house. Bates conceded that she and the Defendant had spoken on the telephone "maybe a hundred" times. The two spoke of sex and marriage during their telephone conversations.

Bates testified that shortly after she met the Defendant, he told her about S.L.'s allegations. He explained to Bates that S.L. had spilled something on herself and said she was wet and that he felt her pants to see how wet they were.

Bates said that the Defendant drove her Cadillac to Nashville on multiple occasions. One occasion was for her to see her psychiatrist, who treated her for anxiety and depression, and another occasion was when he turned himself in to police custody to face the charges in this case. Present in the car were the Defendant's mother and step-father, the Defendant's attorney, and herself. She said she did not remember if they discussed the case against the Defendant. Bates agreed that she had told the Defendant in a telephone conversation that she was going to get a letter from her psychiatrist so she would not have to testify at trial. She explained that this was due to her anxiety. She also told him in another phone conversation that she would have the psychiatrist say that she could not remember everything. Bates agreed that she frequently told the Defendant she loved and missed him.

During cross-examination, Bates testified that she did not know the Defendant at the time the alleged abuse occurred. She further said she had never met S.L.

Kevin Michael Smith, with the Department of Children's Services ("DCS"), testified that, on October 5, 2009, he was assigned a referral alleging sexual abuse by the Defendant. In accordance with their protocol, he and the detective assigned to the case, Detective Michael McCullough, were in an adjacent room when a DCS certified forensic interviewer interviewed S.L. about the allegations in this case. Smith said that S.L.'s father and paternal

grandmother brought S.L. to the interview but neither were present during the interview; both were required to wait in the lobby area. Smith said the interviewer did not ask S.L. any leading questions, and S.L. did not display any indication that she had been "groomed" to tell a particular story.

During cross-examination, Smith testified that when he first received this referral, he spoke with the person who had contacted DCS, Harrison. He said that he first had to determine which county had jurisdiction so that he could arrange for a detective from that county to attend the interview of S.L. After speaking with the county agencies involved, the district attorney's office, and the sheriff's department, he contacted a Rutherford County detective to come to the interview. Smith said he may have also contacted Wilson County Police Department, but, ultimately, it was determined that Rutherford County would send a detective. Smith said that he arranged for S.L.'s interview to occur the following day, October 6, 2009.

Detective Michael McCullough, with the Rutherford County Sheriff's Department, testified that he had been a detective since 1984 and had worked primarily sex abuse cases since the mid 80s. When Smith first called Detective McCullough about this case, Smith informed him that he had contacted authorities in Murfreesboro and Wilson County and that both agencies declined investigation of this case. Detective McCullough testified that he investigated this case for four months and that much of his time was spent determining whether Rutherford County had jurisdiction. He said he reviewed "[c]aselaw" and made the determination that the events that occurred had taken place in Rutherford County.

Detective McCullough said that he was present at DCS when S.L. arrived for her interview. He saw her as she walked through the front lobby. S.L. was then separated from the people who brought her to DCS so that they could not overhear anything that occurred during the interview. The detective observed the interview from the viewing room with his trainee, Lisa Svicak, and Smith. He said he did not see anyone attempt to influence S.L. during the interview. The detective said that, after the second interview, he explained to C.L. that S.L. did not "need to be in the presence of" Harrison until after this matter was concluded. He explained to Harrison that he was not trying to keep S.L. away from her but that, for prosecutorial purposes, the two should not be together for fear that the defense might say that S.L. had been coached.

Detective McCullough said that, on October 7, 2009, Harrison came to the police station, and that she called the Defendant and asked him scripted questions in an attempt to gain an admission from him. The detective said that the Defendant made no admission during the conversation but that he discussed killing himself. Harrison attempted to call the Defendant back, but the Defendant did not answer her calls.

-14-

The detective discussed the steps he took during the course of his investigation. He discussed the evidence he had collected, which included the Defendant's GPS device brought to him by Harrison. Detective McCullough said he brought the device to the first day of trial but it had since disappeared. The last address programmed into the GPS had been S.L.'s address. The detective said he drove S.L. and her father along the route between her house and Harrison's house, but S.L. did not recognize anything. He said that, taking the route suggested by the GPS, there were a few stop lights close to S.L.'s house but that there were long stretches during which there were no stop lights. The detective said the distance between the two houses was approximately fifty miles. He was unable to determine which route the Defendant took when taking S.L. from her home to his home. The detective identified some drawings made by S.L. during her interview.

During cross-examination, the detective testified that he could not say exactly where these alleged acts occurred. He said this was true, in part, because they were alleged to have occurred while the Defendant was driving, and the Defendant could have crossed multiple county lines during the trip. He further testified that S.L. could not tell them the route that they took, and there is a large variation in the possible routes. The detective testified that Harrison gave him the GPS unit more than two months after the alleged incident, and the GPS did not have a "date stamp" on the routes requested.

Detective McCullough testified that he had been trained as a forensic interviewer. He watched S.L.'s interview, and he observed nothing to indicate that she was lying. He said that it was "very easy to stumble [children who were not being honest] and see inconsistencies in their statements." The detective said that he did not test the Pathfinder for DNA evidence because, after speaking with the TBI, they concluded that even a positive test for DNA would not necessarily be helpful to a prosecution. The detective explained that the Defendant could claim that he had masturbated in the car while alone on a different occasion.

Based upon this evidence, the jury convicted the Defendant of two counts of aggravated sexual battery. According to the State's election of offenses, these two convictions were based upon: (1) the Defendant's action of ejaculating and having the victim taste that ejaculate; and (2) the Defendant exposing his naked penis and masturbating to the point of ejaculation in the car with the minor victim at his side. The jury also convicted the Defendant of one count of reckless endangerment based upon the Defendant's course of action in moving the victim to the front seat and allowing her to put his semen in her mouth, knowing that he had been treated for genital herpes and hepatitis C.

## B. Sentencing Hearing

At the sentencing hearing, the State asked the trial court to apply several enhancement

factors. The State said the presentence report showed that the Defendant had previously been convicted of sex abuse and domestic violence, proving enhancement factor (1) applicable, that he had a history of criminal convictions in addition to those necessary to establish his range. T.C.A. 40-35-114(1) (2012). Also pursuant to Tennessee Code Annotated section 40-35-114, the State further contended that two other enhancement factors were applicable: (4) that the victim of the offense was particularly vulnerable because of her age; (7) the offense involved a victim and was committed to gratify the defendant's sexual desire for pleasure or excitement (as it related to the two aggravated sexual battery convictions); (11) the defendant had no hesitation about committing a crime when the risk to human life was high (as it related to S.L. not being restrained in a car seat); (16) the defendant abused a position of public or private trust or used a special skill in a manner that significantly facilitated the commission or the fulfillment of the offense. The State further asked that the trial court run the Defendant's sentences consecutively.

Harrison testified that she had called the police and made multiple complaints against the Defendant while they were dating and during the course of their nine-year marriage. She said that the Defendant had broken her leg, choked and bruised her on numerous occasions, torn her rotator cuff, and head-butted her. She said he had also bitten her and punched her in the face on numerous occasions. She estimated that she had made "[a]bout a dozen" police reports and that the Defendant had been arrested eight times for domestic violence. The Defendant, Harrison said, had several of the convictions expunged. On other occasions she asked for charges not to be pressed against him. Harrison said that the Defendant had an outstanding warrant for an incident that occurred in May 2009 during which he slapped and choked her and told her he was going to kill her.

Harrison testified that the Defendant had a problem with drugs. She was not aware of the history, but she knew he had voluntarily committed himself to a rehabilitation program on two occasions, one of which he did not successfully complete. She said that she had attended numerous Narcotics Anonymous meetings with him. This behavior was before the two were married.

Harrison discussed the Defendant's diagnosis with hepatitis C and genital herpes. She said he was aware that this was something for which he must be constantly monitored. She said that, in the day or two before getting S.L., the Defendant asked for his medication to treat a herpes outbreak.

Harrison read her victim impact statement into the record. It included the effects that the Defendant's actions had upon her and her family.

During cross-examination, Harrison estimated that the Defendant had been convicted

of domestic violence twice in Nashville and twice in Wilson County. Harrison said the Defendant was diagnosed with hepatitis in 2008. She agreed that the Defendant had told her he was "cured" of his hepatitis. She also related that the doctor said the Defendant must have his blood checked every six months. If the hepatitis returned, the Defendant would again be placed on medication.

M.F.L. testified that the Defendant was her mother's brother. She said that her parents got a divorce and moved close to the Defendant, and he would babysit her. M.F.L. recalled that the first time that the Defendant molested her, she was seven years old and lying in her cousin's bed. He came into the room and turned on the lights. She saw that he was naked and playing with himself. He asked her to go to the bathroom with him, and he made her touch him. M.F.L. testified that this behavior occurred infrequently but several times until she was thirteen years old. On that occasion, the Defendant purchased alcohol for her and then got onto a bed. He started playing with himself and asked her to do it, and he asked her to watch. She told him that she was going to call the police because she "wasn't going to take it any more." He stopped engaging in this behavior after that incident.

M.F.L. testified that she never told anyone because she was embarrassed and scared. She said she has suffered as a result. She said she had trust issues with men and confidence issues. M.F.L. said she never would have come forward but for the fact that S.L. came forward and admitted her abuse. M.F.L. read a statement in which she asked the trial court to punish the Defendant to the maximum possible, stating that he would "seek revenge and retaliate if released."

Cathleen O. Barber, Harrison's sister, testified about some of the instances of abuse that Harrison suffered at the hands of the Defendant. She said there had been many, many instances of abuse against her over the years. Barber said she questioned the Defendant about his actions, and he admitted that he had committed them. He claimed, however, that he loved Harrison and that he would never do it again.

Barber said that Harrison was going to divorce the Defendant before she found out that he had contracted hepatitis C. She knew that his insurance would not cover the lengthy and expensive treatment but that hers would. Harrison, therefore, did not divorce the Defendant so he could receive this life-saving treatment.

Barber read her statement, which included that S.L. was "one of the most loving, trusting, and brightest children she ha[d] ever known." She said that the Defendant used the love and trust that S.L. had for him to commit the acts for which he had been convicted. She said that she was worried about the emotional and psychological impact that this would have on S.L. Barber said the Defendant was selfish, manipulative, and cunning. He, in her

opinion, lacked remorse, shame, guilt, and empathy. She further stated that he was narcissistic, paranoid, obsessed with pornography, and sexually promiscuous.

C.L. testified that, before this incident, S.L. had a "[g]reat" relationship with the Defendant. When the Defendant asked to take C.L.'s daughters for the weekend, C.L. trusted the Defendant to take care of them. C.L. installed both girls' car seats, put them in their seats, and then kissed them good bye.

C.L. testified that he witnessed the Defendant's abuse of his mother, sometimes placing his own body between the Defendant and his mother. C.L. recounted that, when he turned eighteen, he got into an altercation with the Defendant. C.L. moved to Florida when he was twenty years old and had only recently returned to Tennessee.

C.L. described how the Defendant's actions had affected his family. He said his children had not seen their grandmother during the fifteen months while this trial was pending. He noted that he had been in counseling to deal with these events. C.L. said the Defendant was a predator who took advantage of innocent people. He asked the trial court to sentence the Defendant to the maximum sentence.

Jerry L. McDaniel testified for the Defendant and said he had known him for forty years. McDaniel testified that the Defendant was a truck driver who provided for his family financially throughout the years. During cross-examination, McDaniel testified that the Defendant told him that he never abused Harrison. The Defendant told McDaniel that Harrison suffered her injuries at work

Flora Harrison Gooshaw, the Defendant's mother, testified about the Defendant's history with drug abuse and his rehabilitation. She testified about his marriage and said that she had been to court with the Defendant when he faced domestic violence charges. Gooshaw testified that M.F.L. was her granddaughter and that the two were close. She said M.F.L. had never previously made any allegations against the Defendant, even though the two talked daily. Gooshaw testified about Harrison calling her and telling her that the Defendant had "done the unforgivable" to S.L. Harrison told her that she was going to file for divorce from the Defendant and that it would cost her $1500. She said that, if the Defendant signed the papers, no one would ever know about S.L.'s allegations. Gooshaw said she relayed that message to the Defendant. The following day, Harrison called Gooshaw again and said that she had told S.L.'s grandfather and her sister.

During cross-examination, Gooshaw testified that M.F.L. told her of her allegations against the Defendant before any of the Defendant's court dates in this case. Gooshaw said she was "shocked" but initially supportive of M.F.L. Gooshaw said that M.F.L.'s allegations

had destroyed her relationship with M.F.L.'s mother, who was Gooshaw's daughter, and with M.F.L.

Based upon this evidence, the trial court first noted that the Defendant had been convicted of two counts of aggravated sexual battery, a Class B felony, and one count of reckless endangerment, a Class A misdemeanor. The trial court then considered several enhancement factors. First, the trial court applied enhancement factor (1), that the defendant had a history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range. *See* Tenn. Code Ann. § 40-35-114(1). The trial court noted that it had heard testimony about numerous instances of domestic abuse, one incident of sexual abuse, and testimony concerning illegal drug use. The trial court then applied enhancement factor (4), that the victim of the offense was particularly vulnerable because of her age. *See* Tenn. Code Ann. § 40-35-114(4). The trial court explained that, while the Defendant's conviction was based upon the victim being under the age of thirteen, the victim, at age six years old, was particularly vulnerable. The trial court also found applicable enhancement factor (10), that the defendant had no hesitation about committing a crime when the risk to human life was high. *See* Tenn. Code Ann. § 40-35-114(10). He noted that the victim had herpes and a potentially transmittable case of hepatitis C when he subjected the victim to his bodily fluids. Further, he took the victim out of her child seat and placed her in the front of the vehicle, subjecting her to a much higher degree of risk and danger. Finally, the trial court found applicable enhancement factor (14), that the Defendant abused a position of public or private trust. *See* Tenn. Code Ann. § 40-35-114(14). The trial court noted that the Defendant was the victim's step-grandparent and that he encouraged the victim's grandmother to make arrangements for the victim to spend the night. He spoke with the victim's parents, who allowed him to take charge of the victim's care based upon their trust in him. The trial court then sentenced the Defendant to ten years for each of the aggravated sexual battery convictions and to eleven months and twenty-nine days for the reckless endangerment conviction.

The trial court considered the factors applicable to a finding of consecutive sentencing, as will be discussed below, and determined that consecutive sentences were necessary in this case. He ordered that the two ten-year sentences run consecutively to each other and concurrently with the misdemeanor sentence, for a total effective sentence of twenty years.

It is from this judgment that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends: (1) the evidence is insufficient to sustain his

conviction for reckless endangerment and one of the counts of aggravated sexual battery; (2) the victim's grandmother's testimony about the victim's initial "complaint" was "so prejudicial that it requires reversal;" (3) the State failed to prove that Rutherford County was the appropriate venue; (4) the State's loss of a GPS device about which there was testimony rendered his trial fundamentally unfair; and (5) the trial court erred when it imposed consecutive sentences.

## A. Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to sustain his conviction for reckless endangerment and for the count of aggravated sexual battery that relied upon his ejaculation and the victim's tasting of his semen. With regard to the reckless endangerment conviction, the Defendant asserts that the likelihood of transmission of a disease by semen was a matter that required far more evidence than presented in this case to support a conviction for reckless endangerment. He asserts that no one testified about the transmittal of herpes or hepatitis C via semen and that no one testified about any possibility of serious bodily injury or death from these infections. The Defendant further contends that his action of allowing the victim to come to the front seat and be buckled by the seatbelt did not place her in imminent danger of death or serious bodily injury.

The Defendant further contends that the act relied upon by the State to support his conviction for aggravated sexual battery in Count 2, namely that he ejaculated and that the victim tasted that ejaculation, does not meet the definition of aggravated sexual battery. The Defendant further notes that the Legislature has recently amended Tennessee Code Annotated section 39-13-109 to include the type of behavior charged in the indictment, making it an offense for a person, who knows they are infected with HIV, HBV, or HCV, to subject another person to their bodily fluid in any manner that presents a significant risk of transmission of the disease.[3] This, he asserts, further indicates that the Defendant's exposure of S.L. to his bodily fluid, without otherwise meeting the elements of aggravated sexual battery, requires reversal of his conviction.

The State counters that the evidence is sufficient to sustain the Defendant's conviction for reckless endangerment based upon Harrison's testimony that the Defendant had an active genital herpes infection and her testimony about how genital herpes is transmitted. The State cites several cases finding that transmission of herpes to a victim of sexual assault constituted a permanent or life-threatening injury. The State asserts that the Defendant has waived his challenge to his aggravated sexual battery conviction by failing to ensure that all the

_____

[3]HIV is the acronym for human immunodeficiency virus; HBV similarly stands for hepatitis B virus, and HCV stands for hepatitis C virus.

evidence relevant to the issue was memorialized in the appellate record. The State notes that the prosecutor asked the victim, "Okay. Hold up your hand. Let me see what he did with it." Neither the Defendant nor the prosecutor articulated in the record the victim's response. Therefore, the State asserts, this issue is waived.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see also Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (quoting *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

## 1. Reckless Endangerment

A person commits the offense of reckless endangerment when he or she "engages in conduct that places or may place another person in imminent danger of death or serious bodily injury." T.C.A. § 39-13-103(a). Reckless endangerment is a Class A misdemeanor. T.C.A. § 39-13-103(b). "'Serious bodily' injury means bodily injury that involves: [a] substantial risk of death; [p]rotracted unconsciousness; [e]xtreme physical pain; [p]rotracted or obvious disfigurement; or [p]rotracted loss or substantial impairment of a function of a bodily member, organ or mental faculty[.]" T.C.A. § 39-11-106(a)(34)(A)-(E).

The Defendant asserts that the likelihood of transmitting a disease by semen was a matter that required far more evidence than presented in this case to support a conviction for reckless endangerment, in that there was limited testimony about the manner in which herpes and hepatis C were transmitted and there was no testimony about whether there was the potential for seriously bodily injury or death from these infections. The testimony at trial, viewed in the light most favorable to the State, proved that the Defendant had an active herpes infection at the time he went to pick up S.L. He then masturbated in front of her culminating with his ejaculation. He tasted his own semen, said it was good, and encouraged S.L. to taste it, asking her if it was sweet or sour. S.L. tasted the Defendant's semen and said it tasted "sour."

Harrison testified that she contracted this disease from her sexual interactions with the Defendant, who failed to tell her he was infected with the disease. Harrison testified that she had educated herself on the disease and had successfully carried two children despite her infection. Harrison explained that she had fewer problems with the disease than many others who were infected. She said the Defendant was required to take medication daily for his disease and that he must apply a second medication to his genital area when he suffered outbreaks. When he returned that Labor Day, he was looking for his medication and was asking Harrison help him to locate it because it was important that he have the medication.

Harrison said that, when S.L. first told her that the Defendant touched her genital area, she was not concerned about the transmital of his genital herpes because transmittal required one to touch the Defendant's genitals while he had an outbreak or from his semen after ejaculation. When S.L. told her about the Defendant's actions of having S.L. taste his semen, she thought the health risks were "too dangerous" to not report the contact to S.L.'s parents and the authorities.

A Federal court has stated:

"Herpes is a highly contagious disease transmitted through sexual activity.

The disease has obvious and detrimental impacts on a person's life-style and relationships. Because of the danger of transmittal of the disease during child birth, medical literature recommends a caesarean alternative. Beyond the physical dimension, the district judge noted the unique emotional and psychological impairments resulting from this assault. '[W]e must appreciate in this case the fact that the disease is permanent, is recurring. And while someone may overcome the psychological trauma of sexual abuse, it's also clear that by virtue of the recurring nature of this particular disease, that it would be [a] constant and recurring reminder of the abusive act itself, or acts in this case.'"

*United States v. James*, 957 F.2d 679, 680-81 (9th Cir. 1992) (concluding that a nine year-old girl infected with genital herpes as the result of repeated sexual assaults has suffered permanent bodily injury); *see also United States v. Reister*, 40 M.J. 666 (Military Rev. 1994) (Genital herpes is a virus which recurs at any time . . . the recurring nature of the disease, along with associated medical problems it can cause, permits it to be considered a means likely to produce grievous bodily harm).

We conclude that the testimony was sufficient to support the jury's finding that the Defendant engaged in conduct that placed or potentially placed S.L. in imminent danger of death or serious bodily injury. There was testimony that genital herpes is a sexually transmitted disease. Harrison stated that she contracted the disease from sexual contact with the Defendant, and she understood that this disease could be contracted by contact with the genitalia during an "outbreak" or by the semen of an infected person. Harrison also stated that this disease required that the Defendant be on medication daily and that he be on additional medication when he had an outbreak. The testimony established that the disease was life-long and reccurring, presenting some of those infected with more problems than others. There was ample testimony to support the jury's finding that the Defendant's actions constituted reckless endangerment.

### 2. Aggravated Sexual Battery

Aggravated sexual battery is defined as "unlawful sexual contact with a victim by the defendant or the defendant by a victim" and the victim is younger than thirteen years old. T.C.A. § 39-13-504. "'Sexual contact' includes the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification. *See* T.C.A. § 39-13-501(6) (2010). A person's intimate parts are defined as including "the primary genital area, groin, inner thigh, buttock or breast of a

human being." T.C.A. § 39-13-501 (2).

As stated by this Court recently in *State v. Mahlon Johnson*, No. W2011-01786-CCA-R3-CD, 2013 WL 501779, at *12 (Tenn. Crim. App., at Jackson, Feb. 7, 2013), *no. Tenn. R. App. P. 11 application filed*:

> This Court has previously examined the statute defining "sexual contact" and concluded "there is no requirement that the sexual contact itself be for sexual arousal or gratification." *State v. Roy Chisenhall*, No. M20003-009560-CCA-R3-CD, 2004 WL 12177118, at *3 (Tenn. Crim. App., at Nashville, June 3, 2004), *no Tenn. R.App. P. 11 application filed*. The Court went on to state that the statute also does not require that the appellant become sexually aroused or gratified by the sexual contact. The statute merely requires touching that can be "reasonably construed as being for the purpose of sexual arousal or gratification." *Id.* (citing T.C.A. § 39-13-501(6) (2010)); *State v. Steven Webster*, No. W1999-00293-CCA-R3-CD, 1999 WL 1097820, at *1-*2 (Tenn. Crim. App., at Jackson, Nov. 22, 1999), *perm. to app. denied* (Tenn. 2000)).

The Defendant contends that his having S.L. taste his semen does not meet the definition of aggravated sexual battery. The State counters that the Defendant has waived this issue because the prosecutor asked the victim to demonstrate what the Defendant did with her hand, and the victim did so, but was silent during this demonstration. The State asserts that, because the Defendant did not memorialize for the record the manner in which S.L. said the Defendant moved the victim's hand, he has waived this issue.

The victim in this case was under thirteen years of age. The issue, therefore, if not waived as the State claims, hinges upon whether the Defendant's action of having the victim taste his semen in the unique manner that transpired in this case is "sexual contact" as defined by the aggravated sexual battery statute. We conclude that the Defendant's actions of having the victim taste his semen meets the definition of "sexual contact" so as to support his conviction for aggravated sexual battery. The victim testified that the Defendant took his penis out of the hole of his pants and "shaked it" and "squeezed it" and that "white stuff" came out. He then encouraged her to place her hand in the semen and taste it. The jury could have reasonably concluded that the Defendant's ejaculate remained on his intimate parts or on the clothing covering the immediate area of his intimate parts, as required by the statutory definition of sexual contact. *See* T.C.A. § 39-13-501(6). The jury further properly concluded that the victim came into contact with the Defendant's intimate parts or the clothing covering the immediate area of his intimate parts when she reached and touched his ejaculate to put it on her fingers, which she then put into her mouth. Finally, the jury properly concluded that the Defendant's actions could "reasonably construed as being for the purpose of sexual

arousal or gratification." As such, the evidence supports the Defendant's conviction.

The Defendant further notes that the Legislature has recently amended Tennessee Code Annotated section 39-13-109 to include the type of behavior charged in the indictment, making it an offense for a person, who knows they are infected with HIV, HBV, or HCV, to subject another person to their bodily fluid in any manner that presents a significant risk of transmission of the disease. This, he asserts, further indicates that the Defendant's exposure of S.L. to his bodily fluid, without otherwise meeting the elements of aggravated sexual battery, requires reversal of his conviction. We find this argument by the Defendant unpersuasive. The Defendant's conduct included more than exposing S.L. to his bodily fluid. The Defendant had S.L. taste his semen, which the jury could have reasonably concluded remained on his intimate parts or on the clothing covering his intimate parts. The Defendant is not entitled to relief on this issue.

### B. Victim's Initial "Complaint"

The Defendant argues on appeal that the victim's grandmother's testimony about the victim's initial "complaint," during which she told Harrison that the Defendant moved her to the front seat of the car and felt her pants to see if they were "wet," was so prejudicial that it requires reversal. The Defendant asserts that the victim's statements to Harrison constituted inadmissible hearsay. The State contends that the victim's statements were not hearsay. The trial court, in a jury-out hearing, concluded that the out-of-court statements were offered to show their effect on the listener, rather than the truth of the matter asserted, and thus did not meet the definition of hearsay.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). As a general rule, hearsay is not admissible at trial except as provided by the rules or otherwise by law. Tenn. R. Evid. 802. Tennessee Rules of Evidence 803 and 804 provide exceptions to the general rule of inadmissibility of hearsay. Because "[n]o factual issue attends" the trial court's determination whether a statement is hearsay, "it necessarily is a question of law." *State v. Gilley*, 297 S.W.3d 739, 760 (Tenn. Crim. App. 2008). Although the application of the various exceptions to the hearsay rule "may initially depend upon factual determinations" to which a reviewing court must defer, the trial court "has no discretion to exclude hearsay exception evidence that is otherwise admissible under the rules of evidence." *Id.* at 760-61. Thus, the appropriate standard of review to be applied to the trial court's decision admitting or excluding hearsay evidence is de novo.[4]

---

[4] We are aware of the disagreement among panels of this court and also with our Supreme Court
(continued...)

-25-

This Court has held that declarations used to prove the effect on a listener are not hearsay:

> "[A]ny time the statement is used to prove the hearer or reader's mental state upon hearing the declaration, words repeated from the witness chair do not fall within the hearsay exclusion. The statement fails the test of hearsay because it is not used to prove the truth of the matter asserted in the statement."

*State v. Carlos Jones*, No. W2008-02584-CCA-R3-CD, 2010 WL 3823028, at *14-15 (Tenn. Crim. App., at Jackson, Sept. 30, 2010) (quoting Neil P. Cohen, et al., Tennessee Law of Evidence, § 8.01[7], at 8-23 (5th ed. 2005)); *see also State v. Venable*, 606 S.W.2d 298, 301 (Tenn. Crim. App. 1980) (noting that the victim's statement was not hearsay because it was offered for its effect on the hearer, the defendant, and established evidence of his motive in returning to the scene of the crime later in the day and threatening the victim); *State v. Robert Allen Zaloba*, No. M2011-00855-CCA-R3-CD, 2012 WL 6690027, at *18 (Tenn. Crim. App., at Nashville, Dec. 26, 2012) (holding that, in a child rape case, the victim's answer to a question about whether he was angry about overhearing a comment that led him to believe that the defendant might be engaged in sexual contact with someone other than himself was not hearsay because it was offered to show the effect on the victim's state of mind), *Tenn. R. App. P. 11 application denied* (Tenn. Apr. 10, 2013).

We conclude in this case that S.L.'s statements to Harrison were not hearsay because the statements were offered to show the effect on Harrison's statement of mind. After hearing the statements, Harrison calmed S.L., put her into bed, and then confronted the

---

[4](...continued)

regarding the appropriate standard of review of the admissibility of hearsay evidence. *See State v. Dotson*, 254 S.W.3d 378, 392 (Tenn. 2008) (in considering an issue involving hearsay, holding that "questions concerning the admissibility of evidence rest within the sound discretion of the trial court, and this Court will not interfere in the absence of abuse appearing on the face of the record"); *Pylant v. State*, 263 S.W.3d 864, 871 n. 26 (Tenn. 2008) (maintaining that the standard of review for hearsay issues is abuse of discretion); *Willie Perry, Jr. v. State*, No. W2011-01818-CCA-R3-PC, 2012 WL 2849510, at *3 (Tenn. Crim. App. July 11, 2012) (stating that standard of review for admissibility of evidence is abuse of discretion); *but see State v. Gilley*, 297 S.W.3d 739, 760 (Tenn. Crim. App. 2008) (stating that whether a statement is offered to prove the truth of the matter asserted is "necessarily a question of law" and is not subject to review under abuse of discretion standard); *State v. Schiefelbein*, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007) (holding that appellate review of hearsay issues is *de novo* with no presumption of correctness); *Willie Perry, Jr.*, 2012 WL 2849510, at *7 (Bivins, J., concurring) (applying *de novo* standard of review to hearsay issues). It is not necessary for us to compare the merits of each position because, for purposes of our determination of this issue, the evidence is admissible under either standard of review.

Defendant. She described her confrontation of him and his reaction. The following morning, Harrison asked the Defendant to leave and not return to their home, and he complied. She also called several people to relay S.L.'s account, including S.L.'s biological father. S.L.'s statements to Harrison were not offered to prove the truth of the statements but rather to prove Harrison's mental state upon hearing the statement. We agree with the trial court that the statements are not hearsay. The Defendant is not entitled to relief on this issue.

## C. Venue

The Defendant next contends that the State failed to prove by a preponderance of the evidence that Rutherford County was the appropriate venue. The State counters that it offered sufficient evidence that the offense was committed in Rutherford County. We agree with the State.

Proof of venue is necessary to establish the trial court's jurisdiction. *See Harvey v. State*, 213 Tenn. 608, 376 S.W.2d 497, 498 (Tenn. 1964); *Hopson v. State*, 201 Tenn. 337, 299 S.W.2d 11, 14 (Tenn. 1957). "Venue is a question for the jury, and can be established by circumstantial evidence." *State v. Young*, 196 S.W.3d 85, 101-02 (Tenn. 2006) (citing *State v. Hamsley*, 672 S.W.2d 437, 439 (Tenn. Crim. App. 1984); *State v. Bennett*, 549 S.W.2d 949, 950 (Tenn. 1977)). To determine venue, the jury is permitted to draw reasonable inferences based on the evidence presented. *Id.* at 102 (citing *State v. Johnson*, 673 S.W.2d 877, 882 (Tenn. Crim. App. 1984)). The State need only prove by a preponderance of the evidence that the charged offense was committed in the county in which the defendant is being tried. *See* T.C.A. § 39-11-201(e) (2010); *State v. Anderson*, 985 S.W.2d 9, 15 (Tenn. Crim. App. 1997); *Bennett*, 549 S.W.2d at 949-50. Slight evidence will be sufficient to carry the State's burden if the evidence is uncontradicted. *State v. Bloodsaw*, 746 S.W.2d 722, 726 (Tenn. Crim. App. 1987).

Tennessee Rule of Criminal Procedure 18 states:

(a) **County of Offense**. Except as otherwise provided by statute or by these rules, offenses shall be prosecuted in the county where the offense was committed.

(b) **Multiple Counties**. If one or more elements of an offense are committed in one county and one or more elements in another, the offense may be prosecuted in either county.

The State's uncontradicted evidence included that the Defendant went to S.L.'s house to pick up S.L. and her sister. S.L.'s house was located in Murfreesboro, which is located

in Rutherford County. The Defendant then drove the children from Rutherford County to Wilson County, where he and Harrison lived. Other evidence showed that the victim said that the abuse occurred in an area where there were a lot of red lights. The detective said that there were multiple stop lights around S.L.'s home in Rutherford County. Further, when Smith, the victim's DCS representative, was attempting to determine which agency had jurisdiction, he contacted both Wilson and Rutherford County law enforcement officers. The officers determined that Rutherford County had jurisdiction, and a Rutherford County detective responded to investigate the case.

We conclude that the State presented sufficient circumstantial evidence for the jury to reasonably conclude that Rutherford County was the proper venue. The Defendant is not entitled to relief on this issue.

### D. GPS Location

The Defendant next contends that the State's loss of the Defendant's GPS device rendered his trial fundamentally unfair. The Defendant asserts that venue was an important issue during the trial and that the State had intended to use the GPS device to help establish venue. He asserts that the State was negligent in handling the GPS device and that, without the GPS device, the State had no proof of where the Defendant drove with S.L. The State counters that the Defendant has failed to offer any proof of the exculpatory value that the GPS device might have possessed or what the GPS device would have otherwise shown. He cannot, therefore, prove that he was prejudiced by the loss of the GPS device.[5]

The Defendant cites *State v. Ferguson* for the proposition that his trial was fundamentally unfair. *State v. Ferguson*, 2 S.W.3d 912 (Tenn. 1999). In *Ferguson*, officers videotaped the defendant's performance on field sobriety tests administered as part of a driving under the influence investigation; however, the taped tests were inadvertently "taped over" before they were viewed by anyone. *Id*. at 914-15. Our Supreme Court determined that, for purposes of applying the Tennessee Constitution's "law of the land" clause to issues of the State's losing, damaging, or destroying potentially exculpatory evidence, a balancing test should be utilized. First, the court should "determine whether the State had a duty to preserve the evidence." *Id*. at 916. If the State failed to discharge a duty to preserve evidence, the court then determines:

1. The degree of negligence involved;

---

[5]The record indicates that the GPS device was later located in an evidence locker. The device was, apparently, never brought to the courtroom.

2. The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and

3. The sufficiency of the other evidence used at trial to support the conviction.

*Id.* at 917.

*State v. Ferguson* governs claims regarding the State's duty to preserve potentially exculpatory evidence. 2 S.W.3d 912, 917 (Tenn. 1999). In the present case, we conclude that the GPS was not potentially exculpatory evidence. The Defendant, in his brief, states that the GPS was going to be used by the State to attempt to prove venue. The loss of the GPS, he asserts, rendered the State unable to prove venue and rendered his trial fundamentally unfair. We have concluded that the evidence presented was sufficient to prove venue. Further, as the Defendant argued at trial and notes in his brief, there was no way for the State, or the Defendant for that matter, to prove that he followed the directions on the GPS. While the last address programmed into the device was the victim's address, the GPS would not record whether the Defendant took the suggested route. We conclude that the State's loss of this piece of evidence did not impede the State's ability to prove venue or render the Defendant's trial fundamentally unfair.

### E. Sentencing

The Defendant asserts that the trial court erred when it imposed consecutive sentences. The Defendant argues that the trial court did not "weigh all the [relevant] factors, but merely gave 'specific reasons' as to one, the relationship between the [D]efendant and the victim[] factor." He further contends that we should review his sentence *de novo* and that *de novo* review favors concurrent sentencing because the aggregate sentence is not reasonably related to the severity of the offenses. The State counters that the trial court properly ordered consecutive sentencing.

At the sentencing hearing, the trial court stated:

Further, the Court finds under the factors for discretionary consecutive sentencing listed in the statute that the [D]efendant in this case is convicted of two or more statutory offenses involving sexual abuse of a minor. The Court considers the aggravating factors arising from the relationship between the [D]efendant and the victim. In this case there was testimony during trial, as well as testimony today, about the relationship that [the Defendant] as a step-grandparent had with his granddaughter and of her love and trust for him.

The Court also has considered the nature and scope of the sexual acts as well as the extent of any residual physical and mental damage to the victim. Even though the victim is only six years old, we cannot – and it is as [the Defendant's attorney] says, difficult to extrapolate what that damage may be. However, the Court would take notice of the horror of these events and of society's horror of this type of activity between a grandparent – even if it's a step-grandparent – and a grandchild.

Further, the Court finds that an extended sentence is necessary to protect the public against further criminal conduct by the [D]efendant, and that a consecutive sentence reasonably relates to the severity of the offenses committed.

The Tennessee Criminal Sentencing Reform Act of 1989 and its amendments describe the process for determining the appropriate length of a defendant's sentence. Under the Act, a trial court may impose a sentence within the applicable range as long as the imposed sentence is consistent with the Act's purposes and principles. T.C.A. § 40-35-210(c)(2), (d) (2010); *see State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008). In 2005, the Tennessee General Assembly amended the sentencing law in order to bring Tennessee's sentencing scheme into compliance with United States Supreme Court rulings on the subject. *See United States v. Booker*, 543 U.S. 220 (2005); *Blakely v. Washington*, 542 U.S. 296 (2004).

Before the 2005 amendments to the Sentencing Act, both the State and a defendant could appeal the manner in which a trial court weighed enhancement and mitigating factors applied to the defendant's sentence. T.C.A. § 40-35-401(b)(2) (2004). The 2005 amendments, however, deleted, as grounds for appeal, a claim that the trial court did not properly weigh the enhancement and mitigating factors. *See* 2005 Tenn. Pub. Acts ch. 353, §§ 8, 9. As a result, the appellate courts were "left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence." *Carter*, 254 S.W.3d at 345-46.

Appellate review of sentences has been *de novo* with a presumption of correctness. *See* T.C.A. § 40-35-401(d) (2010). In a recent decision, the Tennessee Supreme Court reviewed changes in sentencing law and the impact on appellate review of sentencing decisions. *State v. Bise*, 380 S.W.3d 682 (Tenn. 2012). The Tennessee Supreme Court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness." *Id.* at 708; *State v. Caudle*, 338 S.W.3d 273, 278-79 (Tenn. 2012) (explicitly applying the same standard to questions related to probation or any other

alternative sentence).

A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case." *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id.*; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980).

The "presumption of reasonableness" applied to sentences imposed by trial courts "'reflects the fact that, by the time an appeals court is considering a within-Guidelines sentence on review, both the sentencing judge and the Sentencing Commission will have reached the same conclusion as to the proper sentence in the particular case.'" *Bise*, 380 S.W.3d at 703 (quoting *Rita v. United States*, 551 U.S. 338, 341 (2007) and discussing Federal sentencing guidelines). A presumption of reasonableness "simply recognizes the real-world circumstance that when the judge's discretionary decision accords with the [Sentencing] Commission's view of the appropriate application of [sentencing purposes] in the mine run of cases, it is probable that the sentence is reasonable." *Rita*, 551 U.S. at 350-51 (discussing Federal sentencing guidelines).

In conducting its review, this Court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. *See* T.C.A. §§ 40-35-102, -103, -210 (2010); *see also Bise*, 380 S.W.3d at 697-98. The burden is on the appellant to demonstrate the impropriety of his sentence. *See* T.C.A. § 40-35-401, *Sentencing Comm'n Cmts*.

Tennessee Code Annotated section 40-35-115(b) provides that a trial court may order sentences to run consecutively if it finds any one of the following criteria by a preponderance of the evidence:

(1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

T.C.A. § 40-35-115. These criteria are stated in the alternative; therefore, only one need exist to support the imposition of consecutive sentencing. *See id.; State v. Denise Dianne Brannigan*, No. E2011-00098-CCA-R3-CD, 2012 WL 2131111, at *19 (Tenn. Crim. App., at Knoxville, June 13, 2012), *no Tenn. R. App. P. 11 application filed*. The imposition of consecutive sentencing, however, is subject to the general sentencing principles that the overall sentence imposed "should be no greater than that deserved for the offense committed" and that it "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed [.]" T.C.A. § 40-35-103(2), (4).

We conclude that the trial court did not err when it imposed consecutive sentencing. The trial court relied on factor (5), that the defendant was convicted of two statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims. The Defendant was convicted of two counts of aggravated sexual battery against a victim who was six years old at the time of the offenses. He was her step-grandparent, with whom she had a "great"

relationship. As the trial court noted, the residual impact on the victim is not readily apparent, in that she is only seven years old. Consideration, however, of the close familial relationship between the victim and her step-grandparent supports consecutive sentencing. Further, the trial court did not err when it found that an extended sentence is necessary to protect the public against further criminal conduct by the Defendant, and that a consecutive sentence reasonably relates to the severity of the offenses committed. The Defendant is not entitled to relief on this issue.

## II. Conclusion

After a thorough review of the record and relevant authorities, we conclude that the evidence supports the Defendant's convictions, that he received a fair trial, and that the trial court properly sentenced him. Accordingly, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE